The next case for argument is 24-2058 Regeneron v. Mylan. I guess you can guess the first thing we're going to ask you is why we didn't get a 28-J letter. Of course. May it please the Court, I'm Jonathan Ellis on behalf of Celtrion, Inc. So I think I came to the same conclusion as my friends did on the 28-J, and I apologize if it was a wrong conclusion. That this Court would be aware of the decisions in the consolidated, once we're companioned in consolidated appeals here. I take your point, Judge Prost, that another point you might make in a 28-J letter are the distinctions and the differences here and the relevance. But I took the rules of 28-J to not ask for excessive argument. I assume that our discussion this morning would focus in large part around those differences, and I am prepared to address those here. Well, let's focus on the things that it's saying. Which items do you now stand down on, if anything? Sure. So we are not withdrawing our personal jurisdiction or our causal nexus arguments from the case, but we do understand and accept that Samsung controls those issues in this appeal, and so I'm not saying to press them this morning. Okay. So we're left with what? So we're left with ODP here. I think the question on that is whether Celtrion has presented a substantial question that the asserted claims of the 865 patent are invalid under the doctrine of an obvious type double patent. And there are a number of different grounds that we talk about. So there's stability, and there's LICO. The cost of LICO, sure. We only need to affirm on one. We're at the PI stage, and this is just so. You would have to prevail on all of those. I think we have to show a substantial question that none of the three asserted patentable distinctions are, in fact, patentable distinctions. I think the Samsung and Formicon decisions did both address glycosylation and the stability limitations. I think importantly, though... Well, regarding the stability limitations, let me drill down a little bit. Which of the following issues from SB that the SB decision noted were not appealed or challenged? Has Celtrion appealed, and where is it in the briefing? And I'm a long listener. SB has not challenged the district court's finding that the genus of stable VEGF trap formulations is not so small that it anticipates. SB has not appealed the district court's construction of stable. SB doesn't challenge the district court's factual findings that this requirement was not inherent in the 594 patents claim, that a relevant artisan would not have had the motivation to obtain such a high level of native court confirmation, that a relevant artisan would not have reasonably expected to succeed in doing so. That's all from SB. So we actually, I think, if I got all those correct, have challenged every one of those in this case. So we have, in fact, challenged the claim construction of stable after four months in Claim 5 of the 594 patent. But we have a precedential opinion, which says you didn't do it there. No, I'm sorry. Celtrion advanced different arguments than Samsung did. We've advanced it here, and we challenged the construction of stable after four months. So your position is that because it wasn't covered there, because the party didn't raise it, you're free to raise it here. Absolutely, Your Honor. I think the court went out of its way to identify that. We've also challenged the construction of the stability limitation in the 865 patent. That is to say that, what, 98% of the VEGF trap. So you appealed all of those? Yes, Your Honor. Okay. I think the easiest way to sort of cut through on the stability limitation are those two points that I've just identified. And I think they're independent, that you can either construe the 595 of the 594 patent, stable after four months, to require, at least with regard to aggregation, the same 98% native confirmation after two months. Or, alternatively, you can construe the stability limitation, the 98% native confirmation, to speak to aggregation over time, instead of a sort of absolute purity, as Regeneron asserts here. Beginning with the first, I think we start with the plain language of the claim, stable after four months. I think that tells you immediately that we're talking about stability over time. Unfortunately, it doesn't tell you exactly what kind of stability you're talking about. And so you have to look through the specification, a postable look through the specification, to understand what that is. I think if you do, you see that stability does at least include aggregation. That should be no surprise to someone who is skilled in the pharmaceutical arts, that aggregation is a measure of stability. You see that the SEC, measured by SEC, is how it's included there. And then I think the question is, does it include also the 98% after two months requirement? And I think it does. I think the only place that POSA could look in the specification of the 594 patent, the shared specification, to find what sort of native confirmation we're looking at, are examples three and four in the tables there. And what you see is that they all satisfy that 98% native confirmation. Now my friends say that... Is there anything in the specification that you would see and show us that looks like lexicography for the word stable? So we're not making a lexicography argument, but I do think that's what POSA would understand to be required. I think it really turns on two facts. I mean, aren't there other discussions of stable or stability that are not tied to the 98% value? I'm sorry? Aren't there other references to stable or stability in the patent that are not constrained to the 98% value? So there aren't ones that say you don't have to meet 98%. There are discussions of stability that include aggregation and that are measured by SEC. I think you might be referring to the discussion in column six that says that preferably you would start with a fusion protein that's substantially free of aggregates. Are we talking about... I'm having a hard time recalling all the details, particularly since this is the last case of the week. I thought the district court rejected your argument because you were trying to show inherency from examples three and four. So there's two pieces here. The district court rejected our construction of stable after four months. It actually just said stable, but it rejected that argument. And then it separately rejected our independent argument that even if the 594 is not construed to require 98% native confirmation after two months, that it was inherent in the 594. That argument turns on a construction of the 865 stability limitation. Indeed, the only reason that the district court or Regeneron here has offered for why the 98% native confirmation limitation is not inherent is because they have a different reading of that limitation in the 865 patent. And we just think we have the better of that view. This is, again, an issue that wasn't presented in Samsung or Informacon. Indeed, Informacon went out of its way to identify it as not presented. And I think... I want to see if anybody else... I'm ready to move to... I'll call it G, the other point. Glycosylation. Yeah. Because I think this is... With regard to that, I think the evidence here is somewhat different. The evidence is different. I think also the construction is different as well. Samsung identified the fact that... The Samsung decision identified the fact that Samsung had not challenged the construction of the VEGF antagonist limitation in the 594 patent. What about the understanding that all five sites are covered? Isn't that kind of different here? About the five sites resulting in the 30 possible forms? Sure. Yeah. So that goes to the anticipation argument. So first we've got an argument that the VEGF antagonist limitation in the 594 patent by itself is construed, would be understood by the POSA, to refer only to a flibbersept with its glycans intact. That is glycosylated flibbersept at all five sites. I think we have a strong argument on that ground. We have again an alternative argument here that says even if the VEGF antagonist limitation includes a genus, claims a genus of both non-glycosylated and glycosylated flibbersept, that that genus is sufficiently small that the species that's claimed in the 865 patent, the asserted claims, would be anticipated and would be immediately envisioned by the POSA. I'm happy to address either one, but absent questions, I'll... What did we say in the Samsung opinion about that very question? In the Samsung opinion, I don't think the court said anything. In the Formicon decision, what the court said was that Formicon had argued it was a genus of two. That's wrong. It's a genus of 30, and therefore it would not be anticipated. I think importantly, of course, that decision is non-precedential, but... But at the same time, the import of the reasoning there is that the genus must have been too big to say that the genus anticipated. I think that's a fair reading of the reasoning there. I think there's a couple of reasons why I don't think you should follow that reasoning here. The first is, as I said, Formicon is non-precedential. It doesn't bind you. And second, Formicon didn't actually argue that it was sufficiently small. All Formicon argued was that the district court was wrong to see it as a genus of 30 at all. And I do think if you get to the merits of that, that is sufficiently small, sufficiently simple, that a POSA would envision immediately at least a flipper step with all five sites glycosylated. I think if you just step away from the science for a moment and think about a car with five seats, there may be 30 possibilities for where the different seats could be filled, but anyone who knows anything about cars could immediately envision all five being filled. I think that's true here even more in spades, because the only protein in the prior art that's known that has this sequence ID number four, the truncated portion, is a flipper step with all five sites glycosylated. That's discussed daily. If any one of the five locations is glycosylated, does that make it a glycosylated flipper step? I think that is the understanding of the parties, how we're treating that, yes. So then out of the 30 possible iterations, does that mean there's 29 of them are glycosylated? Yes. Because there's only one that would be non-glycosylated? That's right. And I think a POSA would immediately envision, if you have even a 30-member genus of non-glycosylated one and 29 glycosylated, would imagine, envision a glycosylated version, and indeed, I think further, would envision a glycosylated version at all five sites. So that is the argument on anticipation for the glycosylated limitation. The argument on construction is that, in fact, you don't need to get there at all, because the Claim 5 of the 594 patent is properly construed to only teach a flipper step, glycosylated flipper step. You refer to Claim 5 as the reference claim throughout your brief. Of course. Selfie on loss at the district court regarding whether the 594 patent is a proper reference for ODP purposes. Yes, Your Honor. And Samsung affirmed the district court on the same question. How do you justify calling Claim 5 what you want it to be instead of referring it to it by what it is, which is what you argue it should be? So we do argue that the reference Claim 5 is a reference, a proper reference patent in the 594 patent. I think I might have understood you to say that Samsung decided that against us. I don't think that's correct, Your Honor. The Samsung decision expressly said it didn't need to decide, it didn't need to address the arguments about whether 594 was a proper reference patent, because even if it were, it went on to then reject, it found two potentially patentable and distinct limitations. I don't think it's really a very good case that the 594 patent is not a proper reference patent. I think what this Court's cases teach in Reselect and Abbey and Allergan is that the question is whether the reference patent is earlier filed. Just a quick hypothetical. If an applicant is prosecuting an application and there are 20 claims and the examiner allows Claims 1 through 5 but finally rejects Claims 6 through 20, and then the applicant decides, well, I'm just going to take Claims 1 through 5 right now and pay the issue fee on that and cancel Claims 6 through 20, and then I'll try to find another day and file a continuation application to continue to try to work with the examiner on Claims 16 through 20. Would it be your view that the applicants barred from doing that because it should have just kept on fighting for those claims in the first application? So I don't think the inventor would necessarily be barred from doing that. I think if they came in and they filed another continuation patent with the same priority date and the same expiration date, I don't think we'd get to an ODP analysis at all. I think the problem here is that what the inventor did was to say, in order to get the 594 out of the patent office, I'm not going to just give up on some subset of claims. I'm going to terminally disclaim the patent term. And I think when they do that, what Yamazaki teaches or says and holds is that changes the statutory term of that patent protection and can't be undone. I hate to ask another question after your time is up, but the 594 patent's term got tied to a different patent, right? A different, yes. What's the number of that patent? I don't have the number, but I can get it to you. Let's call it the 123. Okay. Is there a reason why you didn't try to make an ODP attack against using the 123 as the reference patent? In that way, then, maybe we would have a more fair comparison because the 594 got tied to the 123, and now what we're really trying to figure out perhaps is whether the 865 likewise ought to be tied to the 123. That could have been an argument we made. I think it's fair to present the one we did. I think that because the terminal disclaimer is a meaningful event. What it does is it cannot be undone, and what it does is make a bargain with the public that when the invention in this patent has expired, the public can practice it, and it's obvious variance. That's the very premise and the purpose of ODP. So whether or not we could have challenged that, I think we are perfectly within our rights to challenge it here, and I think the 594 patent should be considered a popular reference patent, in which case we need to ask have they identified or have we identified substantial question of unpatentability and validity based on the differences that they've identified. Okay, thank you. We'll restore some leeway. Good morning. I think it's still good morning, maybe. No, it's not. Oh, good afternoon. So let me cut to this. You had the luxury of the 28J that you didn't take advantage of. Is it fair to say the other side already conceded two issues are off the table? That's right. So we're left with the one issue, and with respect to that one issue, I think we've recognized that with respect to stability, there is a little bit of a door open left by the other case because of the plant construction otherwise. Why don't you address what your friend addressed with respect to why the results should be different based on this new argument? Sure. Respectfully, I think the door is much less open than it was presented a few moments ago. I think if one looks at pages 12 and 13 of the former con opinion, the claim construction issue about what 98% means is addressed. The court found that it was waived but then wrote on pages 12 through 13, we see no basis for accusing the forfeiture as a substantial argument would be needed to overcome the apparent meaning of the claim language on its face, which requires that at least 98% of the BEJF antagonist is present in native confirmation following storage for two months, a reference simply to a property at that time without calling for a comparison to an earlier time. In fairness to my colleagues, would we consider that dicta? I think one could consider dicta because your colleague said that it had been forfeited, but nevertheless it was addressed. I appreciate that. Whether it's dicta or holding, I think it's right to be honest, and it's not only I who thought it was right. Their expert thought it was right. If you look at A10741, that's their expert, Dr. Tessier's chart, where he's calculating the percent native confirmation after two months, and he's using our construction and the construction that everyone in the two years of this litigation from Milan to all the other defendants have used. There's no subtraction where you sort of make time 0, 100, and then subtract. He didn't do that at 10741. And look at their own preliminary injunction opposition brief below. That's at A10601-602. Celtrion does the same thing. No subtraction over time. They used our construction, the other defendants' construction, the court's construction, and we called them out on this in the opposition, and they said nothing in response, in reply. Their expert agrees with us. He never put in another declaration saying Mia Celtrion was wrong. So when did this construction first come up? It came up in the surreply below. And the court there said, I'll let you offer a surreply. He then said it was waived, of course, because you can't now advance a new construction at a surreply. But nevertheless, the district court proceeded to analyze it and concluded correctly, I think, that it was wrong. There's no basis in the specification to say that there's some difference that is required, some subtraction that's required in order to determine what percent native confirmation there is, because the claim says it's the percent that is present after two months. As this court said nine days ago, it's a reference to a property at that time, not calling for comparison to an earlier time. So we think that construction resolves their first point, which is 98% somehow means some difference. Now, they have another claim construction argument. This is not construing our 865 claims, but rather construing the words stable for four months in what they call the reference claim, claim 5 of the 594 patent. That was waived too. Below, that's found at A-77 and 78. They don't respond in any way to the waiver argument, other than to say somehow it was a new argument by us and they had to respond in sort of reply. I don't think that's correct. This is the exact... We want to briefly deal with the merits of that. Sure. And take your waiver point. I'm happy to deal with the merits, because I think it's exactly what Judge Schen said, which is that the patent at column 6 and column 7 makes clear that the concept of stability is far broader than what they're construing it to mean, which is 98% by SEC. Column 6 shows that stability goes well below 98%, down to 90% and less. And then column 7 explains that stability is a far broader concept than just aggregation measured by size exclusion chromatography and encompasses all sorts of other sorts of stability, chemical stability and otherwise measured in different ways. In fact, this court, again, just... Do you equate substantially free of aggregates as being stable? Yes, and I think that's how it was understood, that that's a desirable component of stability. Right, but in terms of the document itself, the patent, the patent itself doesn't say, when we're talking about substantially free of aggregates, we should be thinking the same thing as stability. It does not use the exact word stability. I agree with you, Judge Schen, but the patent is clear and the person of ordinary skill would have been clear that stability was an important... Sorry, aggregation was an important component of stability. That's one of the most important parts. You don't want these particles to agglomerate because then you get particles, and that's a disaster when you shoot them in the eye. And when the 98% number in your claim, that's referring to the same thing, substantially free of aggregates. That's 98% free.  Yes, yes. So that's right. So it's talking about the same sorts of stability there, and it says this is desirable. You'd like to have at least 90% free of aggregates or less at the time that you formulate it. And then our claim, of course, goes further and says you want 98% as measured by SEC after two months. And so it's a narrower concept of stability than what you see in column six with respect to the number that we have to meet, and then much narrower than what you see in column seven of the patent with respect to the sorts of stability that are issued. So I think what they're trying to do in their claim construction is import certain data from examples three and four of the patent into the claims, so that when it says stable in the 594 of claim five, they're saying, well, you take the 98% from example three and you somehow read it into claim five of the 594. That's, of course, contrary to the most basic principles of claim construction, and the court therefore rejected it soundly. I don't recall if we reject both claim construction arguments by the other side or find them to have been waived. Does that end the matter on stability, or do they still have yet other arguments? They raise, as I understand it, one additional argument that they also forfeited below, which is an argument that 98% would have been obvious somehow that the person of ordinary skill would have gotten there, even if there was a difference. That's addressed by the district court at A112, where he explains that was also forfeited, raised for the first time in a certify brief. But also it's incorrect, and they have no evidence to support it. The district court found at A112 that there's no motivation for 98%, and there's no reasonable expectation of success, citing what's now found at A5238, which is Dr. Trout's testimony, explaining that a person of ordinary skill, in view of the prior art, would not have expected to get 98% free of native confirmation because the prior art showed no native confirmation data for a flip or step. And the relevant prior art, this is the ran abysmab prior art that you discussed with my colleague before, showed less stability and more aggregation when you used 40 milligrams per milliliter. And the district court found, and this is an important finding, I think, at A112, 113, as it relates to ran abysmab compared to a flip or step. A flip or step is a fusion protein. The court called it a Frankenstein kind of molecule, not natural like antibodies. And so what the district court explained at A112, 113, is the person of ordinary skill in the art would have expected a flip or step to be worse than ran abysmab. So that when ran abysmab shows a certain stability, and it showed bad stability in Gaudreau when he used it at 40 milligrams per milliliter. I guess we can't look at Dix, which shows 98%. It wasn't used for this purpose because that would, again, be combining Dix with other prior art. That was never done. That was excluded by the district court as an evidentiary matter because it wasn't preserved in the expert reports below. That was, again, another case. But Dix was not relied on by the preliminary injunction defendants. I'm now mixing cases. I don't mean to confuse you. We're both mixing them. But suffice it to say, it was not relied on here by the preliminary injunction defendants. And with respect to myelin, they tried to rely on it below in a combination, and that was excluded evidentially, not preserved by the expert reports. So I think that's their other argument, though. It's the 98%. And I would submit that they have no response at all to the district court's findings on reasonable expectation of success, especially their only response is on pages 63 of their first brief and page 30 of their reply brief. And what they do is they go back and they say, well, there would have been a reasonable expectation of success to get to 98% at the time of formulation, citing no evidence, by the way. But they say the patent assumes that. That's not the claim, of course. The claim requires 98% after two months. And the district court found, again, A112 relying on copious evidence in the record, that there would be no expectation of success to meet 98% after two months. And so that's why their obviousness argument, even if not forfeited, is unsuccessful on appeal. I guess in your view, if we were to affirm on the stability limitation, that ends the case? That ends the case. I can sit down if you want. I can talk about glycosylation if you want. I'm happy to do that. Well, glycosylation is a little different. So why don't you just spend? We're not going over time. OK. There's no value. I have no desire to do that either, Your Honor. That's why I knew it was on me. There's daylight between the glycosylation arguments here and the glycosylation arguments that were decided in the earlier case. I think that's right. I think it's fair to say that this court did not squarely address the same glycosylation issues. I think the assumption and explicit statements, even by the court nine days ago, reflect that there is a difference in breadth between the 594 patent on the one hand and the 865 patent claims on the other hand, with respect to glycosylation. Necessarily, there has to be. And the sort of analysis that this court undertook about what the differences are and whether or not they were obvious. And so this court did not undertake a claim construction analysis of the source. Is it a genus species issue we're dealing with on the glycosylation? I think that's one way to conceive of it, yes, is that it is a genus of different sorts of proteins in the 594 claims. A genus of 30? It's actually 32. 32? How many of them would be glycosylated? 31 would be glycosylated in response to your questions earlier. I would note, though, that claim 14 of the 865 patent, one of the asserted claims here, requires all five sites to be glycosylated. And though my friend at the bar analogized it to five seats in a car, that was, of course, nowhere in the record. And the district court said that there was no showing by any of the preliminary injunction defendants that the genus was small. As is required to invoke the sort of Petering analysis of anticipation by a small genus. And this court said the same thing nine days ago. If 31 isn't small, what in your view is small? I think Petering had eight, if I recall. Some of the other cases that have applied Petering have applied it up to numbers like 10 or 12, but never 32 in my knowledge of the law. And they never cited any case that would support deeming such a genus small for purposes of the immediately envisaged anticipation line of cases. I guess even, we're just at the preliminary injunction stage, right? So the other side would still have an opportunity to further develop this question on the size of the genus?  Absolutely they could. Absolutely they could. Thank you. Thank you, Your Honor. Thank you. We'll restore two minutes everybody. Yeah, and I want to ask a question. I'm happy to, of course, answer your questions, Your Honor. I practiced law for 20 years in federal courts. And it was routine for the district judge to ask for proposed findings of fact and conclusions of law. And once in a while I'd blanch when I'd get it back and the word proposed was crossed off and it was signed, thinking, jeez, did I get it all right? That's not what this judge did. You attacked him for nakedly signing the proposed findings and conclusions from the other side with just a few changes. So I had my clerk very kindly did a red line of the proposed findings and the judge's actual opinion. And there are a lot of changes in there. Some of them are small. Some of them are substantial, full pages. But it indicates to me that the judge very carefully reviewed those proposed findings and used them as he would. How on earth? You cited some authority which says judges shouldn't just sign off without checking things. Very clearly the judge checked all of this. So let me just say first, if you read that as an attack, it certainly wasn't intended. We did cite this court's case law that says when the order is very, very close to the proposed order, that it doesn't change the standard review, but it warrants close scrutiny. I have a red line, too. I did close a review. And I think the changes are small in my view. And we thought that was relevant. It came within that precedent of this court. That's why we cited it. I would like to, if that would address the stability limitation. I have three points on the 865 stability limitation. The first is my friend said that we forfeited that construction by raising it in a server ply and the district court held as much. It did not. A112 is where there was a waiver finding. And it's all about our obviousness argument, not about our claim construction. There's no finding of forfeiture here. And I don't even take the red brief to actually come out and say we forfeited it. He also said that our argument is inconsistent with the written description argument below. The written description argument that we made there, but not here, was that they didn't describe the full range from 98% to 100%. I don't think there's anything consistent with that argument. And the argument that we're making here about how you should construe that limitation. My friend pointed to the Formicon decision and the tentative construction that the court gave there of the stability limitation. I think it was in the course of finding that argument forfeited, it would be sort of strange to then take that as a construction, a definite construction and of course it is non-presidential. And so that leaves the merits of the claim construction there. And I'd love to address why I think that it is a comparator. That it has to be aggregation over time. What it says right from the get-go is 98% of the VEGF trap, of the VEGF antagonist. A percentage itself is a comparison. As a numerator and a denominator, it must be a comparison. So then you ask what is it a comparison of? Well it's 98% of the VEGF trap. The VEGF trap is the unaggregated to flipper sept. Aggregated to flipper sept is an impurity. It's not a VEGF trap, it's not a VEGF antagonist. So now we ask, well what point in time do we compare the reading at two months to the VEGF antagonist? And I think it only makes sense in the course of this claim to look at what VEGF antagonist was present before you put it into storage. After all, it's a limitation about stability during storage over two months. I think if you... One more quick thought. Sure. One more quick thought. My friend points to the 90%, preferably 90% free of aggregates when you start. Purity is not stability. You could start with 70% pure flipper sept, unaggregated flipper sept. After two months, if you still have 70% unaggregated flipper sept, that's a very stable formulation, even if it was not highly pure. Thank you. We thank both sides. The case is submitted. That concludes our proceeding.